IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MIDLAND STEEL PRODUCTS HOLDING | ) | Case No. 03-10136 ( ) |
| COMPANY, et al.,[1] | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

### DECLARATION OF DARREN SCHWEDE IN SUPPORT OF PETITIONS AND FIRST DAY MOTIONS

Darren Schwede, under penalty of perjury, hereby declares as follows:

1.    I am Chief Financial Officer and Treasurer of Midland Steel Products Holding Company, Midland Steel Products Company, and Midland Steel Products Solon Company LLC, the debtors and debtors-in-possession in these cases (collectively the "Debtors"). I submit this Declaration in support of the relief that the Debtors have requested in each of the applications and motions filed at the commencement of these cases (collectively, the "First Day Motions"). I am familiar with the matters set forth below.[2]

2.    All of the facts set forth in this Declaration are based on my personal knowledge, upon information supplied to me by others at the Debtors' businesses, upon my review of relevant documents, or my opinion based upon my experience and knowledge of the

---

[1] The Debtors are the following entities: Midland Steel Products Holding Company, Midland Steel Products Company, Midland Steel Products Solon Company LLC.

[2] Terms not defined herein have the meaning ascribed to them in the First Day Motions.

Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

3. Part I of this Declaration describes the businesses of the Debtors and the circumstances surrounding the commencement of these chapter 11 cases. Part II sets forth the relevant facts in support of each of the First Day Motions. Part III sets forth the relevant facts in support of the Post Petition Financing.

I.

## Background

4. Midland Steel Products Holding Company ("Midland Holding") is a Delaware corporation with its principal place of business in Cleveland, Ohio. Midland Steel Products Company ("MSPCO") is a wholly-owned subsidiary of Midland Holding. MSPCO is the sole member of Midland Steel Products Solon Company, LLC, an Ohio limited liability company.

5. The Debtors are a leading designer and manufacturer of frame rails, frame reinforcements and frame assemblies/modules. The Debtors sell these products to original equipment manufacturers for the manufacture of medium and heavy-duty trucks, primarily in the class 5-8 truck market in North America. Debtors have two manufacturing locations in Cleveland, Ohio, and an assembly facility located in Garland, Texas. The Debtors' facility in Cleveland, with over 500,000 square feet, is the primary manufacturing facility, with a full complement of equipment, including presses, shears, rollforming, welding, heat treating and programmable piercing and hole punching machinery. The Texas facility is dedicated to the hole

punching/piercing of frame rails and assembly. The Debtors employ approximately 400 employees.

6. The Debtors' total indebtedness is approximately $36,392,000. The outstanding liabilities include the following:

  a. As of the Petition Date (as defined herein), the Debtors are parties to an amended and restated Financing and Security Agreement by and among Midland Steel Products Company and Midland Steel Products Solon Company LLC as borrowers, and Bank of America National Association as Agent and as lender (the "Prepetition Lender"), dated as of October 1, 1999, and amended as of December 28, 2001, (the "Credit Facility"). Pursuant to the Credit Facility, the Debtors are obligated to the Prepetition Lender in the approximate principal amount of $16,700,000 as of the Petition Date (the "Obligations"). The Obligations are secured by what the Debtors believe to be enforceable first priority liens and security interests in substantially all of the Debtors' assets (the "Prepetition Collateral").

  b. In addition, the Debtors have unsecured claims, including trade debt, totaling approximately $13,500,000.

  c. In addition, the Debtors have subordinated debt of approximately $3,500,000 as of the Petition Date, plus unpaid interest.

  d. Accrued post-retirement benefit obligations are approximately $7,100,000.

7. Debtors have been adversely affected by a declining economy. The market for heavy duty trucks has declined by fifty percent (50%) since 1999. A national steel trade association predicts a 15% increase in volume during 2003 and a 20% increase in 2004. Pending that anticipated increase, the Debtors have commenced these chapter 11 cases to stabilize their financial affairs, restructure their operations and commence efforts to negotiate a plan of reorganization.

## II.

## Facts In Support Of First Day Motions

8. The Debtors filed for relief under chapter 11 of the Bankruptcy Code on January 13, 2003 (the "Petition Date"). Concurrently with the filing of these chapter 11 cases, the Debtors have filed a number of First Day Motions. I have reviewed each of these First Day Motions (including the Exhibits thereto) and I believe that the relief sought in each of these First Day Motions is necessary to enable the Debtors to operate in chapter 11 with a minimum of disruption or loss of revenue. The factual background in support of the First Day Motions is set forth below.

### A. Motion to Jointly Administer the Bankruptcy Proceedings

9. The Debtors seek to have their chapter 11 cases administered jointly by the Court. This request is made for administrative convenience, and in order to ensure more efficient chapter 11 proceedings.

10. The Debtors anticipate that numerous notices, applications, motions, other pleadings, hearings, and orders in these cases will affect multiple, if not all, of the Debtors. With three Affiliate Debtors, each with their own case docket, the failure to jointly administer these cases would result in numerous duplicative pleadings filed for each issue and served upon separate service lists. This duplication of substantially identical documents would be extremely wasteful and would unnecessarily overburden the Clerk of the Court and parties in interest.

11. I believe that joint administration, for procedural purposes only, is in the best interests of the Debtors, their estates and their creditors.

B. **Motion for Authority to Make Certain Essential Payments of Prepetition Date Obligations Owed to the Debtor's Employees.**

12. As of November 30, 2002, the Debtors employed approximately 400 employees in hourly, salaried, supervisory, management, and administrative positions (collectively, the "Employees") who performed the day-to-day tasks necessary to the continued operation of the Debtors' businesses.

13. I believe continued service by all the Employees is vital to the Debtors' ongoing operations and their ability to reorganize successfully. The Debtors therefore seek authority to pay certain prepetition obligations to their Employees and to maintain and honor obligations under existing welfare and pension plans as described below.

1. **Employee Wages and Other Compensation.**

14. Certain wages, salaries, and other compensation earned prepetition (collectively, the "Employee Compensation") are unpaid as of this date. The Debtors filed their chapter 11 petitions during their normal payroll period. Some payroll taxes and related obligations have accrued with respect to compensation earned but not yet payable for periods ending on or prior to the Petition Date. In addition, the Debtors have issued checks to some of the Employees, prior to the Petition Date, in payment of claims for the Employee Compensation. Some of these checks may not yet have been presented for payment or may not yet have cleared the banking system and, accordingly, will not have been honored as of the Petition Date.

15. The Debtors believe that the total amount of the Employee Compensation as of the Petition Date does not exceed $329,748. Based on the Debtors' review of their record,

all of the Employees will have unpaid claims in this category that will not exceed $4,650. The Debtors have severance obligations to one of the Employees in an amount not to exceed $75,000.

16. The Debtors need to retain the goodwill and diligent effort of the Employees, because the Employees are critical to the success of the Debtors' reorganization. The Debtors propose, in order to preserve such goodwill and morale, to continue to pay the Employee Compensation, to honor prepetition checks issued for the Employee Compensation, and to continue to apply accrued payroll-related taxes for their intended purposes.

17. The Debtors seek the Court's permission to pay all of the Employee Compensation owed to the Employees, but not in excess of $4,650 per Employee cap. These amounts are relatively small compared to the hardship the Debtors and the Employees would suffer if payments were not made.

### 2. Expense Reimbursements.

18. The Debtors also reimburse the Employees for certain business expenses they incur, including mileage reimbursement for travel, expenses for customer entertainment, and the like (collectively, the "Employee Expense Reimbursements"). Typically, there is a delay between the dates when such expenses are incurred and the date when the Employees actually obtain reimbursement for such expenses. As a result, as of the Petition Date there will undoubtedly be accrued but unpaid Employee Expense Reimbursements.

19. The Debtors propose to continue to pay accrued prepetition claims for the Employee Expense Reimbursements, and to honor prepetition checks issued for the Employee

Expense Reimbursements, in order to preserve the morale of the Employees whose efforts are critical to the success of the Debtors' reorganization.

20. The Debtors pay approximately $19,000 per month to reimburse the Employee expenses. The Debtors believe that the accrued but unpaid pre-Petition Date claims for the Employee Expense Reimbursements are not likely to exceed that amount.

### 3. Vacation Time.

21. Certain of the Employees have accrued rights to vacation time pursuant to existing policies, plans, and procedures of the Debtors. The Debtors propose to honor, in the ordinary course of their businesses and in accordance with those plans, policies, and procedures, the Employees' entitlement to vacation time, which has accrued prior to the Petition Date and becomes usable after the Petition Date, in order to preserve the morale of the Employees. Honoring such claims to vacation time does not involve any cash outlay by the Debtors.

### 4. Health and Insurance Benefits.

22. The Debtors sponsor and maintain several health insurance plans (individually, a "Health Plan," collectively, the "Health Plans"), and have in effect several employment policies, that provide Employees, retirees and their covered dependents with medical, dental, prescription, drug, life insurance benefits, group travel insurance, and accidental death and dismemberment benefits. All of the Health Plans are premium based. The Debtors estimate that $320,000 is due for premiums under the Health Plans. The Debtors propose to pay such amount.

23. The Debtors seek authority to maintain certain long-term and short-term disability and employee assistance plans currently being maintained for the benefit of the Employees (the "Disability Plans"), and to pay claims and expenses relating thereto in the ordinary course of their businesses in accordance with existing policies and practices. The Debtors' estimated net monthly cost of continuing to maintain the Disability Plans is approximately $19,000.

### 5. Pension Plans.

24. The Debtors maintain, and presently fund on an actual basis, a defined benefit plan (the "Pension Plan") that covers substantially all the hourly Employees. Contributions for the Pension Plan, which are based on participants' years of service, are funded annually, in arrears.

25. The Debtors also maintain a 401(k) employees savings plan (the "401(k) Plan"). The Debtors do not match contributions made by the Employees to the 401(k) Plan.

26. The Debtors will be responsible for promptly forwarding to the 401(k) Plan those amounts due to be withheld from the Employees' Compensation currently accrued, but not yet paid, on the Petition Date. Additionally, it is essential to the continued morale of the Employees that the Debtors continue to sponsor the Pension Plans and 401(k) Plans. The Debtors therefore seek permission to continue to maintain and honor their obligations (including prepetition obligations) with respect to all Pension Plans and 401(k) Plans.

### 6. Workers' Compensation.

27. The Debtors' total workers' compensation liability in Ohio is $2,100,000. The Debtors are liable for self-insurance costs, including claims administration and assessments, in the amount of $140,000, paid quarterly. Since the Debtors self-insure for workers' compensation liabilities in Ohio, certain of the Employees may have prepetition claims to workers' compensation benefits. The Debtors believe that it is in their best interest to continue payment of such workers' compensation benefits and expenses related to the administration of these benefits, in order to maintain the morale of Employees. If such payments are not made, the Debtors may lose the right to self-insure for their workers' compensation liabilities. In that event, the Debtors would be required to make payments to the workers' compensation funds in Ohio, which payments could include significant additional costs.

28. I believe that the Prepetition Employee Obligations and Employee Benefits are essential to the Debtors' ongoing businesses and the authority requested in this motion should be granted by the Court.

C. **Motion to Honor Certain Obligations to Customers.**

29. The Debtors' businesses depend on their ability to satisfy existing customers and attract new customers. In the ordinary course of their businesses, as in any business, the Debtors' customers occasionally assert claims arising out of goods or services that do not conform to contract specifications or that are alleged to be deficient in other respects. The Debtors' ordinary practices prior to the filing of their bankruptcy petitions have been to allow credits to customers against outstanding invoices or to be applied against future purchases, in amounts equal to the agreed upon value of any valid claims.

30. Certain of the Debtors' customers may assert claims for such credit after the commencement of these bankruptcy cases that relate to goods that were supplied before the Petition Date. The Debtors seek an order authorizing them to continue their ordinary course of business practices with respect to such credits.

31. To the extent that such relief involves honoring or payment of prepetition obligations, the Debtors submit that such relief is necessary to avoid serious disruptions in customer relationships. The failure to honor such customer credits would have a significant adverse impact upon the Debtors' ability to do business with customers at the level previously enjoyed. Thus, the Debtors submit that honoring their customer credits is necessary and in the best interest of the Debtors, their estates, and their creditors.

### D. Motion to Pay Sales and Use Taxes.

32. In the ordinary course of their businesses, the Debtors incur sales and use taxes to various taxing authorities (the "Taxing Authorities"). There is a lag time between the time when the Debtors incur their obligations to pay taxes and the date when payment of such tax is due. Various Taxing Authorities may, therefore, have claims against the Debtors for taxes that are accrued and owing, but unpaid as of the Petition Date. The Debtors estimate that the aggregate prepetition amount for unpaid taxes, as of December 31, 2002, is approximately $10,000. The Debtors believe themselves to be "current" on these obligations. The Debtors seek authority to pay prepetition sales and use taxes to the Taxing Authorities in the ordinary course of business, as such payments become due.

33. I have been advised, and therefore aver, that most, if not all, of the taxes which the Debtors seek authority to pay constitute so called "trust fund" taxes which must be collected from third parties, including the Employees, and held in trust for payment to the appropriate taxing authority. Those taxes may be entitled to priority status. If so, they must be paid in full under a plan of reorganization. Thus, payment of the taxes at this time affects only timing of payment and does not prejudice the rights of other creditors.

34. Some, if not all, of the Taxing Authorities may audit the Debtors if taxes are not paid forthwith, or seek to hold officers and directors personally liable for payment of such taxes. To the extent any of the Debtors' accrued trust fund taxes are unpaid as of the Petition Date, the Debtors' officers and directors may be subject to lawsuits during the chapter 11 cases. It is in the best interest of the Debtors' estates to eliminate the possibility of such distractions.

E.  **Payment of Certain Prepetition Shipping Charges.**

35. The Debtors seek authority to pay prepetition shipping charges to third parties that the Debtors determine, in the exercise of their business judgment and in their sole and absolute discretion, are necessary and critical to facilitate the delivery, distribution, and sale of products necessary for the Debtors to maintain business, and collection and transportation to or from their customers throughout North America.

36. The Debtors operate a vast distribution network for the shipment of their products to and from their customers. Although the Debtors control the vast majority of their sales and distribution through company employees and their company-owned facility, in many

instances the shipment and transportation of products is handled by independent, third-party commercial common carriers, including, among others, trucking companies and railroads (collectively, the "Shippers"). The Debtors' ability to use their distribution capacities is crucial to their ongoing business operations. The Shippers are an integral part of Debtors' businesses. The Debtors depend heavily on the Shippers to timely and efficiently move materials and inventory to and from the Debtors' customers.

37. The Debtors seek to pay the shipping charges for several reasons. The Debtors believe that if the prepetition shipping charges are not paid, many of the Shippers will refuse to perform additional services for the Debtors, causing the Debtors to incur significant additional expenses (*e.g.*, premium shipping charges paid to alternate shippers) in the day-to-day operation of their businesses. At the very least, replacing Shippers would delay the movement of supplies and finished products to and from the Debtors' businesses. Any such delay, even of minimal duration, would have a devastating effect on the Debtors' operations and cause irreparable harm to the Debtors' valuable relationships with their customers.

F. **Motion to Pay Critical Vendors**

38. The Debtors require numerous materials that are necessary for the continued operation of their businesses, which are categorized by commodity types. For example, the Debtors require steel coils, steel sheets, and steel strips, plus charges for related steel processing. Many of these essential products are available solely from one vendor, or from a limited number of vendors (collectively, the "Critical Vendors"). In the normal course of their businesses, the Debtors use the Critical Vendors to supply materials.

39. Most of the Critical Vendors are not under contract with the Debtors or have contracts that are terminable for any reason upon short notice. In many cases, the Critical Vendors supply materials on an as-needed basis and are paid an agreed-upon rate for the materials provided. The Critical Vendors generally are not paid in advance. Payment of the debts to the Critical Vendors is accommodated in the budget for DIP Financing presented to the Court contemporaneously with the First Day Motions.

40. The Critical Vendors are an integral part of the Debtors' businesses. The Debtors depend heavily on the supply of materials necessary to continue their businesses. Even more important, it would be difficult, if not impossible, to find replacements for many of the Critical Vendors. For example, in the ordinary course of business, the Debtors regularly purchase materials from the Critical Vendors who are the sole suppliers of certain products in the surrounding area. The Debtors cannot simply go out into the market and replace this source for the materials; there are no others that sell the materials provided by the Critical Vendors. Without continued service from, and the ongoing support of the Critical Vendors, a large portion of the Debtors' businesses would grind to a halt.

41. Finally, the Debtors believe it is likely that some of the Critical Vendors will, upon learning of the commencement of these cases, seek to assert liens on supplies or other materials currently in their possession. This will delay the Debtors' ability to produce their product, and thus delay their ability to satisfy orders from their customers, causing irreparable harm to the Debtors' valuable operation.

G. **Motion Regarding Utilities and Request for Adequate Assurance.**

42. The Debtors, in connection with their operations, obtain electricity, water, natural gas, telephone services, and or similar services through numerous accounts with various utility companies (collectively the "Utility Companies"). The Debtors seek an order preventing the Utility Companies from terminating service or requiring additional deposits in connection with their provision of services, except in compliance with the procedures set forth in the order accompanying the First Day Motions.

43. It is important to the Debtors' businesses and their successful reorganization that utility services continue uninterrupted. Even a brief discontinuation of utility services would severely disrupt the Debtors' ongoing operations and jeopardize their reorganization efforts.

44. The Debtors submit that the Utility Companies already have adequate assurance that postpetition invoices will be paid, because the Debtors have adequate liquidity under their postpetition financing and because the grant of an administrative expense priority for unpaid postpetition utility services provides assurance of payment the Utility Companies. The Debtors therefore submit that no additional adequate assurance of payment for postpetition utility service is warranted.

45. Accordingly, the Debtors seek entry of an order establishing procedures among other things: (a) that the Utility Companies are forbidden to discontinue, alter or refuse service on account of any unpaid prepetition charges, or to require payment of a deposit or receipt of other security in connection with any unpaid prepetition charges, absent further order of the Court; and (b) that any of the Utility Companies may request additional assurance of

payment in the form of deposit or other security as long as request for adequate assurances is made within thirty days of the entry of an order under this motion.

46. This relief protects the rights of the Utility Companies to seek adequate assurance of payment while simultaneously protecting the Debtors' interest in assuring continued availability of essential utility services. I believe the procedure described in this motion will protect the Debtors from discontinued and/or disrupted service and provide the utility companies an opportunity to seek adequate assurances.

## H. Applications for Retention of Professionals.

### 1. Retention of McDonald Hopkins Burke & Haber Co., L.P.A.

47. The Debtors seek to retain the firm of McDonald, Hopkins, Burke & Haber Co., L.P.A. ("McDonald Hopkins") as their bankruptcy counsel with regard to the filing and prosecution of these chapter 11 cases, effective as of the Petition Date. The Debtors' application requests the entry of an order pursuant to section 327(a) of the Bankruptcy Code authorizing them to employ and retain McDonald Hopkins as their attorneys under a general retainer to perform the legal services that will be necessary during these chapter 11 cases.

48. The Debtors seek to retain McDonald Hopkins because of McDonald Hopkins' extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganization under chapter 11 of the Bankruptcy Code, and because McDonald Hopkins' appearance before the Court for the applications, motions, and other matters in these chapter 11 proceedings will be efficient and cost effective for the Debtors' estates. The Debtors

believe that McDonald Hopkins is both well-qualified and uniquely able to represent them in their chapter 11 cases in a most efficient and timely manner.

### 2. Retention of Pachulski, Stang, Ziehl, Young & Jones P.C.

49. The Debtors seek to retain the firm of Pachulski, Stang, Ziehl, young & Jones P.C. ("PSZYJ") as their bankruptcy counsel with regard to the filing and prosecution of these chapter 11 cases, effective as of the Petition Date. The Debtors' application requests the entry of an order pursuant to section 327(a) of the Bankruptcy Code authorizing them to employ and retain PSZYJ as their attorneys under a general retainer to perform the legal services that will be necessary during these chapter 11 cases.

50. The Debtors seek to retain PSZYJ because of PSZYJ'sextensive experience and knowledge in the field of debtors' and creditors' rights and business reorganization under chapter 11 of the Bankruptcy Code, and because PSZYJ's appearance before the Court for the applications, motions, and other matters in these chapter 11 proceedings will be efficient and cost effective for the Debtors' estates. The Debtors believe that PSZYJ is both well-qualified and uniquely able to represent them in their chapter 11 cases in a most efficient and timely manner.

51. Furthermore, the Debtors submit that PSZYJ's proximity to the Court, experience in chapter 11 cases and general reputation warrant approval of its retention. The Debtors require experienced Delaware Counsel.

## III.

### Post Petition Financing

52. The Debtors are seeking entry of an order authorizing them to obtain debtor in possession financing (the "DIP Financing") from GMAC Business Credit LLC ("GMAC") as to grant to GMAC first priority liens and security interests in the Debtors' postpetition accounts and inventory. The Debtors also propose to grant to GMAC liens and security interests in all of their other assets – including prepetition accounts receivable and inventory – subject to existing liens and security interest, including the security interests of the Debtors' prepetition lender, Bank of America, N.A. The Debtors propose to provide adequate protection of Bank of America's interests in the prepetition collateral by collecting all amounts paid on prepetition accounts and paying such amounts to Bank of America and by paying to Bank of America 80% of the costs of the prepetition inventory consumed by the Debtors.

53. By, in essence, "purchasing" the prepetition inventory from Bank of America, the Debtors will have sufficient raw material, work in process and finished goods to continue to operate and ship product to customers. To pay for that "purchase", and to pay operating costs immediately post petition, the Debtors will borrow up to $7 million, on an interim basis, and up to $11 million on a final basis, from GMAC on an "out-of-formula" basis – in other words, a portion of the funds advanced will be without sufficient postpetition collateral. GMAC would receive, as security for those advances, a guaranty from, one or more of the Debtors' customers.

54. To facilitate the DIP Financing, Customers have been asked to provide certain extraordinary accommodations to GMAC in the form of Inventory Purchase/Setoff Limitation Agreements and the Guaranties (the "GMAC/Customer Agreements"), as discussed in more detail in the motion.

55. Absent the extraordinary accommodations described in the GMAC/Customer Agreements, GMAC will not provide for the necessary financing to continue operating Debtors as required to fulfill the Purchase Orders and sufficiently supply the Customers with Component Parts. The DIP Financing is essential to enable the Debtors to meet their postpetition obligations and continue in operation. Without the DIP Financing, the Debtors would be forced to cease their operations, and the Debtors, their estates and their creditors would be irreparably harmed. Accordingly, the Debtors require the Interim DIP Financing to ensure that the Debtors are able to meet all of their post-Filing Date obligations.

56. The salient provisions of the DIP Financing are as follows:

    a. <u>Borrowers</u>: Midland Steel Products Company, Midland Steel Products Solon Company, LLC and Midland Steel Products Holding Company.

    b. <u>Facility Amount and Availability</u>. A revolving credit limit of up to $11,000,000 million (the "DIP Facility Amount") will be made available to fund the working capital requirements of the Debtors, so long as the Debtors' expenditures do not exceed, in both timing and amount, the dollar amounts set forth in the Budget. Up to $7 million dollars will be available upon the entry of the Interim Order; the balance of $4 million will become available upon the entry of the Final Order.

    c. <u>Interest</u>. All loans outstanding under the DIP Credit Agreement other than out of formula loans and certain inventory based loans shall bear interest at the prime rate plus 1.5%, interest on overformula loans and certain inventory-based loans (as more detailed in the Financing Order) will bear interest at the prime rate. All interest shall be paid monthly in arrears until paid in full.

    d. <u>Commitment Termination Date</u>. The earliest of (i) January 15, 2004, (ii) the date of confirmation of a plan of reorganization, (iii) the day which is 30 days after

the entry of the Interim Order if the Final Order has not been entered within such 30-day period, and (iv) such earlier date on which the loans shall become due and payable pursuant to the terms of the DIP Financing Order.

      e.    <u>Fees and Expenses</u>. The Debtors shall pay a Closing Fee of $110,000 and a Facility Fee of $60,000.

      f.    <u>Priority and Collateral</u> The DIP Lenders shall have (i) a first priority lien on all of Postpetition Collateral, and (ii) a junior lien on Prepetition Collateral, subject to the Carve Out. In addition, GMAC will be entitled to superpriority, administrative expense claim status in the Debtors' cases, subject only to the Carve Out.

      g.    <u>Carve Out</u>. Those liens granted to GMAC to secure the Debtors' obligations under the Financing Order shall be subject only to (i) payment of allowed and unpaid professional fees and disbursements incurred by the Debtors and any statutory committees appointed in the Cases, in an aggregate amount not in excess of $260,000, and (y) the payment of unpaid fees pursuant to 28 U.S.C. § 1930 and to the Clerk of the Bankruptcy Court (collectively, the "Carve-Out").

      h.    <u>Defaults</u>. The DIP Credit Agreement provides for various Events of Default, which are set out in paragraph 18 of the Financing Order.

      i.    <u>Remedies Upon Default</u>. GMAC has all remedies available to it under the DIP Loan Documents or under applicable law. GMAC is required to provide five (5) days' notice to the Debtors and their counsel, counsel to Bank of America, counsel to any official creditors' committee and to the United States Trustee, before it can, among other things, foreclose on the collateral for the DIP Loans. Should any party in interest contest the exercise by GMAC of its right to foreclose, such party may only challenge whether an Event of Default has occurred.

57.    The urgent need to preserve the Debtors' business and avoid immediate and irreparable harm to the Debtors' estates, as set forth in this motion, makes it imperative that the Debtors be authorized to obtain authority to borrow funds pursuant to the terms and conditions of the Financing Order as of the Filing Date, pending the Final Hearing. As noted above, the Debtors are seeking to borrow, on an interim basis, $7 million. Without the Interim Financing, the Debtors would likely be unable to meet their post-Filing Date obligations. The denial of Interim Financing would irreparably damage the going concern value of the Debtors' businesses, and cause substantial prejudice to their estates and their creditors.

58. I believe that entry of the order granting Interim Financing is in the best interest of the Debtors, their estates, and their creditor.

### Conclusion

For the forgoing reasons, I respectfully submit that the relief sought in the First Day Motions is necessary and appropriate, and request that the Court grant the requested relief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: January ___, 2003

_____
Darren Schwede
Chief Financial Officer and Treasurer